UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CrunchTime! Information Systems, Inc., <br>     *Plaintiff*, <br><br> v. <br><br> Frisch's Restaurants, Inc., <br>     *Defendant*. | Case No. 23-cv-13195 <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff CrunchTime! Information Systems, Inc. ("CrunchTime") brings this action against Frisch's Restaurants, Inc. ("Frisch's") and alleges as follows.

INTRODUCTION

1. In 2022, Frisch's entered a software license agreement with CrunchTime. In 2023, the parties amended the agreement to implement a revised payment schedule and otherwise affirmed Frisch's obligation to pay for the software licenses.

2. Frisch's later changed its mind and decided it wanted out of the deal. The problem was not with CrunchTime or its software, but with Frisch's new plan to sell off its restaurants to franchisees: When Frisch's realized its contractual obligations would not just disappear, Frisch's panicked and stopped cooperating with CrunchTime's efforts to implement the licensed software. Then Frisch's sent a sham notice of default to CrunchTime alleging that CrunchTime breached a nonexistent contractual obligation. Frisch's then (a) requested that CrunchTime "cure" the breach by implementing software at several locations; and (b) stopped communicating with CrunchTime and stonewalled when CrunchTime continued to seek Frisch's cooperation to install the software.

3. Frisch's knowingly engaged in deceptive conduct and breached its contract with CrunchTime as well as its duty of good faith and fair dealing. And Frisch's strained reading of the parties' agreements creates an actual controversy about the parties' rights and duties under those agreements. CrunchTime now brings this action to recover what Frisch's owes and to be made

1

whole for Frisch's wrongful, deceptive conduct.

## PRELIMINARY STATEMENT

4.      This is a suit for deceptive conduct, breach of contract, breach of the duty of fair dealing, and declaratory relief under the common laws of the State of Massachusetts and Massachusetts General Laws Chapters 93A and 231A Section 1.

5.      CrunchTime seeks damages in excess of $75,000 and declaratory relief.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 (exclusive of interest and costs), and there is complete diversity between the parties because CrunchTime is a citizen of Massachusetts and Delaware, while Frisch's is a citizen of Ohio.

7.      Venue is proper in this court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because Frisch's is subject to the court's personal jurisdiction with respect to this action.

8.      The parties have consented to the exclusive jurisdiction of the state and federal courts sitting in the Commonwealth of Massachusetts through the contract underlying this dispute.

## PARTIES

9.      Plaintiff CrunchTime! Information Systems, Inc. is a Delaware corporation with its principal place of business at 129 Portland Street, Boston, MA 02114.

10.     Defendant Frisch's Restaurants, Inc. is an Ohio corporation with its principal place of business at 2800 Gilbert Avenue, Cincinnati, OH 45206.

## BACKGROUND

11.     CrunchTime is a one-stop-shop for restaurants seeking an operations platform to meet all their inventory, scheduling, and management needs. More than 125,000 restaurants in

over 100 countries use CrunchTime's software.

12. Frisch's is a burger chain with dozens of locations throughout the Midwest and one in Georgia. It is most known for its "Big Boy" caricature.

13. On December 20, 2022, CrunchTime and Frisch's executed a Master License Agreement ("Agreement") wherein Frisch's agreed to purchase a variety of software licenses for its 87 locations for a four-year term, and CrunchTime agreed to "provide access to the Licensed Software." *See* Ex. 1 (Agreement).

14. CrunchTime delivered the software to Frisch's and provided the software environment, database, and access to Frisch's.

15. Each software platform CrunchTime builds must contain information provided by the customer about their business and also integrate with a licensee's existing point-of-sale system. CrunchTime cannot provide usable software without information from a licensee about, for example, how it labels its inventory. Licensees (such as Frisch's) must therefore do their part and provide necessary data so that CrunchTime can calibrate the software for the licensee's intended use.

16. Because building Frisch's operations platform required Frisch's cooperation and coordination, the Agreement provided that "delays in CrunchTime's performance caused by Licensee's failure to perform its obligations . . . shall not constitute a breach of [the] Agreement." If CrunchTime were required to activate software or make it accessible to a licensee by a specific date, a licensee could simply refuse to provide access to its locations or withhold the information necessary for CrunchTime to build the operations platform to get out of the contract.

17. Under the Agreement, Frisch's cannot avoid its payment obligations by withholding cooperation with respect to software installation. *See* Ex. 1 (Agreement) § 4(A) ("In consideration for the licenses granted and services provided hereunder, Licensee shall pay to CrunchTime the fees set forth in Exhibit C. Such payments shall be made in accordance with the payment schedule set forth in Exhibit D."). The contract is structured in this way because CrunchTime invests significant time and energy to integrate its software with each licensee's existing tools and

meet its unique needs in the weeks and months leading up to installation.

18. In March, Frisch's tried to back out of the deal. At the time, Frisch's claimed it was seeking to cancel the Agreement because it did not believe that CrunchTime's software would be up and running quickly enough. This cancellation request invented a date for CrunchTime to implement the software—a date which was not anywhere in the Agreement—and then cited that date as the basis to back out of the Agreement.

19. CrunchTime was left in the dark for months before Frisch's came back to the table. It then came to light that the real reason Frisch's had tried to renege on the Agreement was because Frisch's had decided to franchise some of its restaurants. The parties began to negotiate potential amendments to the agreement, and on July 17, 2023, Frisch's publicly announced that it was selling a group of its restaurants to franchisees.

20. On July 19, 2023, the parties executed the Amendment to the CrunchTime! Information Systems, Inc. Master License Agreement ("Amendment"). The Amendment altered the payment schedule under the Agreement and otherwise affirmed Frisch's obligations under the agreement.

21. The Amendment implemented a number of changes. First, it reduced the number of licensed restaurant locations from 87 to 78. Second, it changed the manner in which fees accrue at individual restaurant locations. The Agreement originally provided that "[f]ees at individual Sites begin accruing and being billed once the Licensed Software has been accepted in accordance with Section 3(c) of the Agreement, and after such acceptance, all 87 site locations are billable by July 1, 2023." Ex. 1 (Agreement) at 20. The Amendment removes the condition that software be accepted at a location before fees accrued and instead provides: "A minimum of 3 locations are billable on October 1, 2023. 75 additional locations are billable on March 31, 2024 or on the date Locations begin processing transactions in CrunchTime, whichever date comes first." Ex. 2 (Amendment) § 2. In other words, the Amendment requires Frisch's to begin paying for licenses on October 1, 2023 even if Frisch's backed out or dragged its feet and regardless of whether the software was running on site, with all locations billable in March 2024. Third, to account for

locations possibly being sold before the software was rolled out—and to prevent CrunchTime from having to work with different owners location-to-location to fine tune the platform at each site—the Amendment provided:

> A location is able to be transferred to a Frisch's franchisee only after having been active on the platform for a minimum of 3 consecutive months and upon the Franchisee signing a contract directly with CrunchTime.
>
> Ex. 2 (Amendment) § 2.

Fourth, the Amendment increased pricing for transferred locations by 10% to account for increased costs and risks associated for CrunchTime in dealing with different owners. *Id.*

22. At some point, Frisch's decided that it did not want to follow through on this deal, either. So Frisch's chose to try and fabricate reasons to avoid its contractual obligations at CrunchTime's expense. The closer CrunchTime got to implementing and operationalizing the software, the more Frisch's stalled, eventually going dark entirely.

23. On August 10, 2023, weekly meetings began between Frisch's and the CrunchTime implementation team, and throughout August, Frisch's was responsive to CrunchTime's requests for inventory and product information needed to build out the operations platform.

24. On September 6, 2023, Frisch's and CrunchTime discussed a timeline and outstanding tasks for the operations platform to go live at a few sites. Frisch's pushed for an October 1, 2023 target date but then failed to deliver the information CrunchTime requested (and needed) to configure and test the software.

25. On September 7, 2023, CrunchTime emailed Frisch's that rolling out the platform in mid-October would "require focused efforts" from Frisch's and CrunchTime.

26. Joe Roman (Frisch's IT Director) responded by asking CrunchTime to "tell us what we are lacking on our side. Just trying to get a more defined goal ie. 'if we do this and get these results we will go live on X-Date'. . . . Just trying to get a date we can hit. If you say this is all in the plan and 10-15 is the date, then OK."

27. CrunchTime then responded with exactly that information, explaining that

upcoming testing sessions required Frisch's to build a schedule within the software program and submit sales-data examples from the finance teams. It was also "critical" for the necessary members of Frisch's team to attend the testing session.

28. Frisch's team then went on vacation during mid-September and pushed back the testing sessions. After vacation, Frisch's team eventually provided some of the items CrunchTime requested but failed to stage or format the data in a way to make it usable. Frisch's then dragged its feet on the few remaining action items into October.

29. On October 5, 2023, Frisch's mailed a letter to CrunchTime purportedly notifying CrunchTime of an alleged default of a nonexistent obligation to implement software in at least three locations by October 1, 2023 ("Notice"). The Notice asked CrunchTime to cure the alleged "breach" within 30 days.

30. Meanwhile, CrunchTime's implementation team was still in the process of seeking Frisch's cooperation to install the software. On October 9, 2023, CrunchTime emailed seeking a status update on the remaining actions items. Frisch's did not respond. Two days later, CrunchTime emailed Frisch's to confirm whether the weekly meeting scheduled that day would still take place. Frisch's did not respond.

31. What CrunchTime's implementation team did not know was that Frisch's had already abandoned the project, hoping to shirk its payment obligations on the concocted basis that CrunchTime failed to meet a non-existent October 1 deadline. But it is impossible for CrunchTime to breach an obligation it never had. Neither the Agreement nor the Amendment require software implementation by October 1, 2023. Frisch's confuses its own payment obligation—which began inflexibly on October 1, 2023—with CrunchTime's obligation to use "commercially reasonable efforts" to activate the software. Even if CrunchTime were required to implement software on October 1, 2023, "delays in CrunchTime's performance caused by Licensee's failure to perform any of its obligations . . . [do] not constitute a breach" of the Agreement. Exhibit 1 at § 2(A).

32. After requesting that CrunchTime "cure" the fabricated breach by installing the software, Frisch's farce was proven when it ignored CrunchTime's implementation team's

outreach on October 9 and skipped the October 11 weekly meeting without rescheduling. In other words, the notice of default and request to cure were a sham. Frisch's did not want CrunchTime to deliver a final product—to the contrary, Frisch's was actively preventing CrunchTime from implementing the software so that Frisch's could attempt to justify nonpayment after CrunchTime had expended significant time and effort on the project. CrunchTime now brings the following claims for relief.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

33. CrunchTime repeats and incorporates the preceding paragraphs as if fully set forth herein.

34. On December 20, 2022, CrunchTime and Frisch's entered into a valid and enforceable licensing agreement. Ex. 1 (Agreement).

35. On July 19, 2023, CrunchTime and Frisch's entered into a valid and enforceable amendment to the licensing agreement. Ex. 2 (Amendment).

36. In exchange for software licenses and services, Frisch's agreed to pay CrunchTime according to the pricing provided in the Amendment.

37. CrunchTime performed, substantially performed, or was ready, willing, and able to perform its obligations under the Agreement and Amendment. Alternatively, CrunchTime was excused from performing under the Agreement and Amendment.

38. Specifically, CrunchTime used commercially reasonable efforts to activate its software at Frisch's locations as required by the Agreement. Additionally, CrunchTime was ready, willing, and able to perform its obligation to make the licensed software accessible.

39. On or about August 31, 2023, Frisch's materially and substantially breached the Amendment and Agreement by failing to make payment to CrunchTime. Additionally, Frisch's materially and substantially breached the Amendment and Agreement by failing to make other payments on subsequent dates.

40. Frisch's breaches were material because they concern Frisch's payment obligations, which are an essential and inducing feature of the contract.

41. As a direct and proximate result of Frisch's breach, CrunchTime has sustained and continues to sustain damages.

42. CrunchTime's damages include lost profits and expenses it incurred in developing Frisch's operations platform.

### SECOND CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing

43. CrunchTime reincorporates by reference the preceding paragraphs, including Paragraphs 34–36 regarding the existence of a contract between the parties.

44. During September and October of 2023, Frisch's breached its implied covenant of good faith and fair dealing by failing to provide the information CrunchTime required and requested to complete development and implementation of Frisch's operations platform in order to prevent CrunchTime's implementation of Frisch's operations platform and create a pretextual basis for Frisch's refusal to perform its payment obligations.

45. Frisch's further breached its implied covenant of good faith and fair dealing by sending the Notice as pretext for repudiating its payment obligations.

46. As a direct and proximate result of Frisch's breach, CrunchTime has sustained and continues to sustain damages.

47. CrunchTime's damages include lost profits and expenses it incurred in developing software for Frisch's.

48. CrunchTime's damages flow directly from and are the natural and probable consequences of Frisch's breach.

### THIRD CLAIM FOR RELIEF

### Violation of Massachusetts General Laws, Chapter 93A § 2

49. CrunchTime repeats and incorporates the preceding paragraphs as if fully set forth herein.

Case 1:23-cv-13195-NMG   Document 1   Filed 12/26/23   Page 9 of 11

50. CrunchTime and Frisch's dealings constitute a commercial relationship which occurred while both CrunchTime and Frisch's were engaged in trade or commerce.

51. Frisch's violated Chapter 93A of the Massachusetts General Laws ("Chapter 93A") by engaging in deceptive conduct or practices which had a likelihood to deceive or mislead CrunchTime and which reasonably could have caused CrunchTime to act differently from the way CrunchTime would have otherwise acted.

52. Frisch's knowingly violated Chapter 93A by sending CrunchTime the sham Notice to extract a benefit and justify Frisch's wrongful repudiation of its payment obligations.

53. Frisch's knew that CrunchTime had no "obligations to implement the Licensed Software at a minimum of 3 locations by October 1, 2023." Frisch's invented this obligation as a threatening tactic to gain leverage against CrunchTime and intimidate CrunchTime against enforcing its rights to payment.

54. Frisch's also knowingly violated Chapter 93A when it first used this same tactic through the March 2023 cancellation request, which Frisch's fabricated to create leverage in subsequent dealings between the parties related to CrunchTime's decision to enforce its contractual rights or any reengagement by Frisch's.

55. Frisch's breach of the Agreement and Amendment go beyond mere breach of contract and have an extortionate quality giving it the rancid flavor of unfairness.

56. Frisch's conduct is a knowing violation of Chapter 93A, and those violations were a substantial cause of CrunchTime's injuries.

57. As a foreseeable and proximate result of Frisch's conduct, CrunchTime has suffered a loss of money or property, including (but not limited to) significant expenses for the development and implementation of an operations management platform for Frisch's, lost profits, and interest lost on money Frisch's withheld.

58. CrunchTime is engaged in the conduct of trade or commerce and may recover for its losses under Section 11 of Chapter 93A.

59. The center of gravity of the circumstances giving rise to this claim is primarily and

9

substantially in Massachusetts, and the Agreement is governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. Ex. 1 (Agreement) § 14.

60. CrunchTime's losses are an adverse effect of Frisch's unfair or deceptive conduct, and CrunchTime is therefore entitled to recover its reasonable attorney's fees.

61. Because Frisch's conduct amounts to knowing or willful violations of Chapter 93A, CrunchTime is entitled to recover up to three times its actual damages.

### FOURTH CLAIM FOR RELIEF
### Declaratory Relief

62. CrunchTime reincorporates by reference the preceding paragraphs.

63. An actual controversy exists between CrunchTime and Frisch's over the parties' rights and duties under the Agreement and Amendment. *See* MASS. GEN. LAWS ch. 231A §§ 1, 2. Specifically, Frisch's alleged in the Notice that CrunchTime was in default of an obligation to implement the licensed software at a minimum of 3 Frisch's locations by October 1, 2023. CrunchTime disputes that any such contractual obligation exists or existed under the unambiguous text of the Amendment.

64. Declaratory relief will clarify the rights, obligations, and status of the parties under the Agreement and Amendment and is therefore appropriate to resolve this controversy.

65. CrunchTime seeks a declaration that it had no obligation to implement the licensed software at a minimum of 3 Frisch's locations by October 1, 2023.

### PRAYER FOR RELIEF

CrunchTime respectfully prays for judgment in its favor against Frisch's on all claims and seeks the following relief:

a. actual and/or compensatory damages, with the exact amount to be proven at trial;

b. treble damages;

c. declaratory relief;

d.  attorney's fees;

e.  court costs and pre- and post-judgment interest at the maximum rate allowed by law; and

f.  any such other and further relief to which CrunchTime may be entitled at law or in equity.

Respectfully submitted,

**SUNSTEIN LLP**

*/s/ Kevin R. Mosier*
John T. Gutkoski (BBO # 567182)
Kevin R. Mosier (BBO # 703739)
100 High Street
Boston, MA 02110
jgustkoski@sunsteinlaw.com
kmosier@sunsteinlaw.com

*Attorneys for Plaintiff*

**CLEVELAND | KRIST PLLC**

*/s/ Tim Cleveland*
Timothy Cleveland*
Austin H. Krist*
Ben Dillon*
303 Camp Craft Rd., Suite 325
West Lake Hills, Texas 78746
(512) 689-8698
tcleveland@clevelandkrist.com
akrist@clevelandkrist.com
bdillon@clevelandkrist.com

*Attorneys for Plaintiff*

*Applications for Admission Pro Hac Vice Forthcoming